EVERGREEN WASTE SYSTEMS, INC., an Oregon corporation, and ABC Garbage Co., an Oregon corporation, Plaintiffs,

v.

METROPOLITAN SERVICE DISTRICT, an Oregon municipal corporation, the City of Portland, Oregon, an Oregon municipal corporation, and Norm Wietting, Defendants.

No. CV 86-9-PA.

United States District Court, D. Oregon.

May 15, 1986.

Richard Maizels, P.C., Portland, Or., for plaintiffs.

Eleanore S. Baxendale, Metropolitan Service Dist., Denise Francis, Deputy City Atty., Portland, Or., for defendants.

PANNER, Chief Judge.

Plaintiffs Evergreen Waste Systems, Inc. and ABC Garbage Co. (referred to collectively as Evergreen) bring this action to invalidate a local ordinance governing use of a landfill. Defendants are the Metropolitan Service District (District), the City of Portland (City), and Norm Wietting, a District official. I find for defendants.

Evergreen brings three claims. In its first claim, Evergreen challenges an ordinance that prohibits the deposit of waste from outside the District at a District-operated landfill. Evergreen, which had hauled waste from Washington to the landfill in Oregon, contends the ordinance violates the dormant commerce clause.

In its second claim, Evergreen contends that the District irrevocably dedicated the landfill to use by the public-at-large. Thus the ordinance violates Evergreen's equal protection rights.

In its third claim, Evergreen contends that the District violated its equal protection rights by imposing discriminatory credit levels on Evergreen before the ban took effect.

Evergreen moved for a preliminary injunction. The parties agreed that the issues would be tried to the court, and that trial of the merits should be consolidated with the preliminary injunction hearing. As I have indicated in previous orders, I found for defendants on each of plaintiffs' claims. This opinion supplements those orders.

## STANDARDS

Plaintiffs have the burden of proving their factual allegations by a preponderance of the evidence.

Because I find for defendants as to each of plaintiffs' claims, I need not consider the standards applied to preliminary injunction motions.

## FACTS

The parties submitted a stipulated statement of facts. I summarize the statement here, and make further findings based on the affidavits, testimony, and other evidence received at trial.

The land at issue here is the St. John's Landfill (St. John's). St. John's is on a 255 acre site, only some of which can still be used for landfill. The City has owned St. John's since 1934, when the City bought it with proceeds of a bond issue. Since 1980, the District has operated St. John's under an agreement with the City.

To operate the landfill, the District must obtain a permit from the Oregon Department of Environmental Quality (DEQ). Operation costs of the landfill have been incurred by the City, the District, and the State of Oregon, but these have been reimbursed by "tipping fees" paid by garbage haulers using St. John's. Out-of-state haulers paid a higher fee to make up the contributions from local revenues.

The District consists of three Oregon counties in the Portland metropolitan area: Multnomah, Washington, and Clackamas Counties. Haulers from other counties, including counties in the State of Washington, have also used the landfill. The City and the District never intended, however, to irrevocably dedicate St. John's to use by the public-at-large.

In December 1985, the District enacted an ordinance prohibiting the deposit of waste from outside the District at St. John's. The purpose of the ordinance was to extend the life of the landfill, which is nearly full. By using several waste reduction programs, the District hopes to extend the landfill's final capacity to October 1989. At that point, the landfill should reach the maximum height allowed by DEQ. The District hopes to have a new landfill in operation by then.

The ban ordinance affects haulers in both Washington and Oregon, principally those from Clark County, Washington and Columbia County, Oregon. Haulers from these counties accounted for about ten percent of the monthly deposits at St. John's before the ban. Clark County haulers deposited about 5,000 tons of waste per month at St. John's during summer 1985. Columbia County haulers deposited about 800 tons per month.

Columbia County opposed the proposed ban. County officials appeared at the District Council meeting concerning the ordinance and requested that the Council either delay the date the ban would take effect, or exempt Columbia County from it. The Council refused. Haulers from Columbia and Yamhill Counties, Oregon, who hauled garbage to St. John's after the ban took effect have been turned away.

Evergreen hauls garbage from Clark County, Washington. Before the ordinance was enacted, Evergreen used St. John's for its garbage. After the ban took effect, Evergreen began using a landfill in Woodburn, Oregon, south of the District. The Woodburn landfill charges more per ton of waste and is farther away than St. John's, requiring larger expenditures for labor, fuel, and equipment maintenance. Although there is a similar landfill in Clark County, the cost per ton there is so high that the trip to Woodburn is justified.

## DISCUSSION

1. *The Commerce Clause Was Not Violated.*

Evergreen's first claim is for violation of the dormant commerce clause. The commerce clause does not apply here because the District is a market participant. Even if the commerce clause applied, the District did not violate it.

The leading cases on commerce clause challenges to bans on out-of-state waste are the Supreme Court's decision in *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and Judge Belloni's decision in *One-Way Disposal, Inc. v. City of Portland*, CV 80–08 (D.Or. April 25, 1980).

In *City of Philadelphia*, the Court struck a New Jersey statute that prohibited the importation of most waste collected outside the state. Because the statute reflected simple economic protectionism of a resource, the Court applied a virtual per se rule of invalidity. Where nonprotectionist goals were intended or where effects on interstate commerce were only incidental,

however, the Court indicated that a balancing test should apply.

[W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. But where other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade, the Court has adopted a more flexible approach, the general contours of which were outlined in *Pike v. Bruce Church, Inc.*:

"Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535 (citations omitted), *citing Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

■ Application of the *Bruce Church* test is appropriate here. The District was not acting to prohibit the use of all potential landfill within its jurisdiction, as had New Jersey. Rather, it was acting only to conserve landfill at St. John's until another landfill could be opened. The effects on interstate commerce here are also incidental. The amount of garbage transported to St. John's from southwest Washington was relatively small, only 5,000 tons per month. There are two nearby landfills in southwest Washington that are available to Washington haulers, albeit at a higher cost. Evergreen, moreover, continues to bring its garbage to Oregon, using the Woodburn landfill. Because the effect on interstate commerce was so incidental, I apply a balancing test rather than a per se rule of invalidity.

■ The ordinance satisfies *Bruce Church*, which requires that the ordinance: (1) regulate evenhandedly; (2) be based on a legitimate local public purpose; (3) have only an incidental effect on interstate commerce; and (4) not burden commerce excessively in relation to putative local benefits. *Washington State Building and Construction Trades Council v. Spellman*, 684 F.2d 627, 630–31 (9th Cir.1982) (Washington statute prohibiting transportation and storage within state of radioactive waste produced outside state violates dormant commerce clause), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983).

■ The first requirement is satisfied. Haulers from outside the District are treated evenhandedly. No distinction is made as to whether they bring garbage that originates inside or outside Oregon. The second and third requirements are satisfied for the reasons discussed above. The fourth requirement is also met. The burdens here on interstate commerce are slight, as discussed above. The District's ability to prolong the life of St. John's outweighs the burden imposed on haulers bringing garbage from Washington, as well as those bringing garbage from Oregon counties outside of the District.

Evergreen relies heavily on Judge Belloni's ruling in *One-Way Disposal, supra*. Relying on *City of Philadelphia*, Judge Belloni struck a City of Portland ordinance that banned the deposit at St. John's of garbage from outside the District. *One-Way Disposal* is distinguishable. As Judge Belloni stressed, the parties there stipulated that the ordinance affected only Washington haulers, as the City Council intended. The effect on interstate commerce was direct. The District's ordinance does not suffer from these infirmities.

## 2. *The District Is A Market Participant.*

The District also argues that it is not subject to commerce clause scrutiny because it is a market participant. I agree. Thus, even if the ordinance failed the *Bruce Church* test, it would still be valid.

The Court in *City of Philadelphia* expressly reserved this question, noting that it expressed no opinion "about New Jersey's power, consistent with the Commerce Clause, to restrict to state residents access to state-owned resources ... or New Jersey's power to spend state funds solely on behalf of state residents and businesses." 437 U.S. at 627 n. 6, 98 S.Ct. at 2737 n. 6 (citations omitted).

Judge Belloni was also not presented with this issue in *One-Way Disposal.* Two courts that have faced the issue, however, have concluded that government operated landfills are market participants, and that the commerce clause does not apply to bans like this one. *Shayne Bros. v. District of Columbia,* 592 F.Supp. 1128 (D.D.C.1984) (upholding District of Columbia health regulation prohibiting disposal of "out-of-state" waste in District facilities); *County Commissioners of Charles County v. Stevens,* 299 Md. 203, 473 A.2d 12 (1984) (upholding ban on deposit of "extra-county" waste in county-owned landfill).

■ I follow *Shayne* and *Stevens.* When states or their subdivisions act as market participants rather than market regulators, the commerce clause does not apply. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (upholding Maryland regulatory scheme in which state purchased auto hulks from in-state wreckers only). State-owned businesses may even favor in-state customers in times of shortage. *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980) (as market participant, cement plant owned by South Dakota may favor in-state customers during cement shortage.

The Court in *Reeves, Inc.* rejected the argument that South Dakota's practices were protectionist, and that an exception to the market participant doctrine should be made because of this.

We find the label "protectionism" of little help in this context. The State's refusal to sell to buyers other than South Dakotans is "protectionist" only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve. [Plaintiff's] argument apparently also would characterize as "protectionist" rules restricting to state residents the enjoyment of state educational institutions, energy generated by a state-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps "protectionist" in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve the citizens of the State.

*Reeves, Inc.,* 447 U.S. at 442, 100 S.Ct. at 2280 (footnote omitted).

■ The District acts as a market participant here. By operating St. John's, the District sells a service to haulers, just as other governmental units provide schools and police to their citizens, and sell power and even cement to them at favorable rates and terms. *Shayne Bros.,* 592 F.Supp. at 1134.

It is true that dictum in *Reeves, Inc.* indicates that the market participant exception may not apply in cases involving natural resources, including landfill.

Cement is not a natural resource, like coal, timber, wild game, or minerals. *Cf. Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727 [60 L.Ed.2d 250] (1979) (minnows); *Philadelphia v. New Jersey, supra* (landfill sites); *Pennsylvania v. West Virginia,* 262 U.S. 553, 43 S.Ct. 658 [67 L.Ed. 1117] (1923) (natural gas); *West v. Kansas Natural Gas Co.,* 221 U.S. 229, 31 S.Ct. 564 [55 L.Ed. 716] (1911) (same); .... It is the end product of a complex process whereby a costly physical plant and human labor act on raw materials. South Dakota has not sought to limit access to the State's lime-

stone or other materials used to make cement. Nor has it restricted the ability of private firms or sister States to set up plants within its borders.... Moreover, [plaintiff] has not suggested that South Dakota possesses unique access to the materials needed to produce cement. Whatever limits might exist on a State's ability to invoke the *Alexandria Scrap* exception to hoard resourcers which by happenstance are found there, those limits do not apply here.

*Reeves, Inc.,* 447 U.S. at 443–44, 100 S.Ct. at 2281.

I do not follow this language here. The Court in *City of Philadelphia* noted that it had not examined the market participant issue. *City of Philadelphia* dealt with a statute that closed New Jersey's borders to all garbage from outside the state. New Jersey in effect hoarded all land available for landfill. Here, nothing prevents private operators from purchasing land in the District and developing it for landfill. Nor has Evergreen argued that the District owns all the potential landfill sites within its borders, or that other sites cannot be developed. *Stevens,* 473 A.2d at 19.

The District also argues that landfills are much more than just a raw resource. Rather, they are highly regulated, costly waste disposal facilities. The District contends that it spends millions of dollars annually to meet state and federal law and to provide leachate control, temporary and final cover, roads, and drainage.

There is little evidence in the record to support these contentions. While there is evidence of state regulation, there is scant evidence of what landfill operations entail. The *Stevens* court described many of these functions, however, and I take judicial notice of them. It is likely that the District performs the same functions at St. John's.

I agree with the District that a complex metropolitan landfill operation is not a natural resource to which commerce clause scrutiny should apply. Like the cement plant in *Reeves, Inc.,* the District has developed a complex plant. The District is not hoarding raw land, it is providing a public service to its residents.

Evergreen argues that the Supreme Court abandoned the market participant theory in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 1016, 83 L.Ed.2d 1016 (1985). *Garcia* is distinguishable. In that case, the Court abandoned the traditional government function/proprietary activity test announced in *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Court in *Garcia* found the test unworkable. Thus a state subdivision did not have tenth amendment immunity from federal minimum wage and hour requirements, as Congress had power to regulate under the "affirmative" commerce clause.

This case involves the dormant commerce clause, which governs state rather than federal activity. The market participant test is also quite workable. While it may have been difficult to determine under *National League of Cities* whether a given service was traditional or merely proprietary, it is much simpler to determine that the government has entered the market and is in fact providing a service.

The Court has also rejected the notion that the traditional function/proprietary activity test should apply to dormant commerce clause cases. The minority in *Reeves, Inc.* suggested that the test should apply in such cases. 447 U.S. at 447 n. 1, 452 n. 3, 100 S.Ct. at 2283 n. 1, 2285 n. 3 (Powell, J., dissenting). The majority silently rejected this approach.

*Garcia* does not apply. The market participant exception applies here, and the District fits within it.

3. *St. John's Landfill Was Not Irrevocably Dedicated To Use By The Public-At-Large.*

Evergreen contends in its second claim that the District implicitly and irrevocably dedicated St. John's for use as a landfill by the public-at-large, including Washington residents.

Oregon law controls this issue. In *Security Investment Co. of Oregon City v. Oregon City*, 161 Or. 421, 90 P.2d 467 (1961), the court's opinion provides the following principles.

1. To constitute a valid dedication, there must be an intention on the part of the owner to devote his property to a public use, and this intention must be clearly and unequivocally manifested in cases of express dedication.

2. Dedication is not presumed.

3. The party asserting dedication has the burden of proving it by clear and satisfactory evidence.

4. While express dedication may be shown by acts resting on parol, they must be of such a public and deliberate character as makes them generally known and not of a doubtful intention.

*See* 161 Or. at 432–33, 90 P.2d 467.

██ On the other hand, where the public has used the dedicated land for a public purpose for a long time, with the knowledge of the owner and without objection, an intent to dedicate will generally be presumed. *Mid-County Cemetery District v. Thomason*, 267 Or. 637, 641, 518 P.2d 174 (1974).

██ These requirements have not been satisfied here. While land may be dedicated for public use, a service may not be. As the *Stevens* opinion shows, a landfill is a complex operation rather than an undeveloped piece of land. The City and the District have charged a fee to haulers who used the service, which indicates controlled, permissive use. Only portions of the landfill site have been available to haulers. An incinerator building was built on part of the site, which is now used as a record storage facility. The alleged dedication could never be irrevocable. DEQ has set a height limit on St. John's. The District is already exploring new uses for the site for after the landfill closes. There was no intent to dedicate, and no dedication.

**4. *The Equal Protection Clause Was Not Violated.***

Evergreen also contends in its second claim that its equal protection rights were violated because the District discriminatorily infringed on the alleged dedication. I reject the claim.

There was no dedication. Because the equal protection claim is based on the alleged dedication, there is no equal protection claim. Even if there were a dedication, the equal protection clause was not violated.

██ Regulations dealing with health, welfare and the economy are entitled to deferential review under the equal protection clause. *See, e.g., Alexandria Scrap, supra* (rejecting equal protection challenge to classification separating in-state and out-of-state operators); *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (upholding advertising ban on certain vehicles). There was a rational relationship between the classification here and a legitimate governmental purpose, the District's desire to extend the life of the landfill. The ordinance does not violate equal protection.

Evergreen contends in its third claim that its equal protection rights were also violated because the District unfairly limited Evergreen's credit. There is no evidence to support this claim. Any claim for injunctive relief is also mooted by my ruling that the District may continue to exclude Evergreen from future use of the landfill.

## CONCLUSION

I find for defendants as to each of plaintiffs' claims. Plaintiffs' motion for preliminary injunction is denied as moot. This opinion constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).